KENNARD ET AL. *v.* McKAMER REALTY COMPANY ET AL.

(Three Appeals In One Record.)

[No. 131, September Term, 1960.]

*Decided March 17, 1961.*

*Motion for rehearing filed April 14, 1961, denied April 19, 1961.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Tucker R. Dearing, Paul J. Cockrell* and *W. A. C. Hughes, Jr.,* with whom were *Juanita Jackson Mitchell, Julius P. Robinson* and *Archie D. Williams* on the brief, for the appellants.

*Walter C. Mylander, Jr.,* and *Charles C. W. Atwater* for the appellees.

HORNEY, J., delivered the opinion of the Court.

The three cases consolidated for the purpose of this appeal were instituted as separate actions aimed at testing the validity of the judicial sale of the Laurel Cemetery in Baltimore City.

Mamie E. Kennard, Julia Jones and Lillian Waters, (the respective plaintiffs below and the appellants here, all of whom had an interest in certain cemetery lots as owners or assignees), in appealing the adverse rulings of the Circuit Court of Baltimore City, contend (i) that the decree directing sale of the cemetery was procured by a fraud on the court; (ii) that the decree *pro confesso* and final decree in the cemetery sale proceeding were void for failure to file the affidavit required by Maryland Rule 105 g; and (iii) that Code (1957), Art. 16, § 120, is unconstitutional for several reasons.

The original Laurel Cemetery Company (incorporated in 1852) owned and operated a burial ground on Belair Road. The cemetery then, and until recently, consisted of about fifteen or sixteen acres of land. During the late thirties, however, it fell into a state of neglect. In or about the year 1939, John G. Kaufman, one of the appellees, purchased an interest in the cemetery after it had been reincorporated (following forfeiture of the original charter) as the New Laurel Cemetery and subsequently acquired sole ownership.

None of the lot owners had been required to contribute to a perpetual care fund and despite the attempts of at least two lot-owner associations to improve conditions in the cemetery, their efforts were only temporary and the cemetery continued to deteriorate. After Kaufman became the sole share-

holder-owner, no money was received by the corporation from the sale of lots or for burials in the cemetery. The gravedigger recalled that after the end of the forties his work dropped off considerably and that only two (he later said three or four) persons were buried in the cemetery during the late fifties.

On December 31, 1952, as a result of his inability to interest anyone in buying lots and because of the general rundown condition of the cemetery, the sole shareholder-owner filed a voluntary petition in bankruptcy on behalf of the cemetery. Upon, or shortly after, the filing of the bankruptcy petition, Kaufman took the records of the bankrupt cemetery corporation to the trustee in bankruptcy, but was told to keep them himself. The records were returned to his office and stored, but when a search was made for them in 1957 they could not be found. During the period of about four and one-half years following the institution of the bankruptcy proceeding, the cemetery continued to be an eye-sore in the community, and the trustee had been unable to find a purchaser. Finally, on June 27, 1957, the bankruptcy court approved a sale of the cemetery for a nominal consideration to the Mc-Kamer Realty Company, which had been incorporated by Kaufman and Clement R. Mercaldo and Lloyd G. McAllister, the other two individual appellees, as the directors and sole shareholders, for the express purpose of accepting title to the cemetery property.

On December 10, 1957, after the realty company had quit-claimed several of the cemetery lots to Anderson Enterprises, Inc., a bill of complaint was filed in an admittedly "friendly suit" for a sale of the cemetery property pursuant to the provisions of § 120 (of Art. 16).[1] Notice by publication in a

---

1. This section applicable only to Baltimore City, was enacted as Chapter 630 of the Acts of 1957, and provides in effect that where seventy-five per cent of a cemetery—in which the land or property therein has been dedicated to or used for burial purposes and lots have been sold for which deeds or other written instruments were executed or issued to the purchasers without a provision for perpetual care and maintenance of such lots—has been abandoned or becomes a menace or detrimental to public health, safety, security or

daily newspaper (The Daily Record) published in the City of Baltimore was made in accordance with the statute, but none of the lot owners or other interested parties published against, other than Anderson Enterprises, appeared or answered in obedience to the notice of publication, and a decree *pro confesso* was entered in due course without proof by af-

---

welfare, any person having a property right in such cemetery or any public agency having an interest in the abatement of conditions therein which have become a public nuisance shall have a right to file a bill of complaint setting forth the facts and the names of the owners of cemetery lots or their assignees so far as the same may be known. There is also a provision for notice to all persons in interest (residents or nonresidents, adults, infants and other persons under disability) "by publication" or "by posting the premises," and for the taking of testimony ex parte or otherwise. Another provision authorizes the court, if it is satisfied that the cemetery has been abandoned or has become a menace or detriment to the general public welfare, to appoint a trustee and order a sale of the cemetery and the lots and "every interest" therein upon such terms, conditions and notices as the court may deem proper. A further provision (and the final one pertinent to this case), concerning the distribution of the proceeds of sale, requires, among other things, the removal and reinterment of all bodies in another burial ground purchased for the purpose as well as the removal and proper relocation of all undamaged monuments and markers. Apparently there are only two substantial differences between this statute and the state-wide statute (§ 119), which is also applicable to Baltimore City. The first of these differences concerns the basic jurisdictional requirements for a valid sale: in § 120 the requirement is that it must appear that there has been a 75% abandonment of the cemetery or that it has become a menace or detriment to the general public welfare; while in § 119 the requirement is that the sale be expedient or to the interest and advantage of the parties concerned. The other difference concerns the distribution of the balance of the proceeds of sale: in § 120 such proceeds are payable to the legal entity having record title to the cemetery in its entirety (as disclosed by the land records) immediately prior to the sale, free, clear and discharged of and from all claims of lot owners and other interested parties; while in § 119 the surplus proceeds are distributable among the parties interested according to their several interests. With respect to this last difference, it should be noted that § 120 applies only to those cemeteries which sold lots therein "without provision having been made for the perpetual care and maintenance of such lots."

fidavit as to what efforts had been made to locate and warn the defendants of the pendency of the action.

The chancellor referred the cemetery sale proceeding to a master, who, after taking testimony and visiting the property in person, reported to the court that "all known as well as unknown parties having any interest" in the proceeding had been made parties; that he had concluded that the cemetery had been abandoned; that it was detrimental to the public health, safety and welfare in that it was a haven for persons with criminal intent and the scene of frequent brush fires; and that it would be for the best interests of the public and lot owners that the cemetery be sold, and recommended that a trustee be appointed to sell the property.

By the final decree, passed on June 18, 1958, the chancellor (Carter, J.) ordered a sale of the cemetery and appointed Edward A. Anderson (of Anderson Enterprises) as trustee to make it. About a month later the trustee entered into an agreement to sell the cemetery property to Belair Road Enterprises, a newly formed corporation, of which the three individual appellees became the sole shareholders shortly thereafter. The sale price of $15,500, in addition to the costs of the proceeding and counsel fees, reflected the estimated cost and expense of disinterring the bodies and removing the grave stones and markers in the Laurel Cemetery and the reinterment and replacement thereof in a newly purchased cemetery in Carroll County. The sale was promptly reported to the court, but before the order *nisi* had expired, the corporate buyer filed exceptions to the ratification of the sale and assigned as reasons therefor that all persons having rights or an interest in the property had not been made parties and that the provisions of § 120 (of Art. 16) were unconstitutional. The chancellor, adopting the memorandum of law submitted by two of the appellees, who were acting as counsel for the trustee, overruled the exceptions and finally ratified and confirmed the sale.

After the reinterments had been completed, the trustee in January of 1959 filed another report accounting for the expenditures he had made of the proceeds of sale, and executed

a deed to the corporate purchaser on February 5, 1959. The report and account of the auditor was finally ratified on March 20, 1959.

More than thirty days later, after all decrees and decretal orders had become enrolled, three separate "bills of review" —the initial pleadings in the Kennard, Jones and Waters cases hereinbefore referred to—were filed in the court which had decreed the sale of the cemetery property. The Jones and Waters cases were tried together before Warnken, J., on December 18, 1959, and both were dismissed following a short oral opinion. For some reason, not entirely clear, the Kennard case was tried separately by Sodaro, J., on March 7, 1960, (after the usual annual rotation of judges in Baltimore City had taken place), and was also dismissed for the reasons set forth in a full written opinion, in which he rejected all of the contentions of the appellants on the merits.

Ordinarily, an enrolled decree may be set aside on a bill of review for error apparent on the face of the decree or for newly discovered evidence, or on an original bill for fraud. But, if a case has not been heard on its merits, there are two instances when an enrolled decree may be set aside on a petition filed in the original proceeding: (1) where the decree was entered by mistake or surprise or (2) where the circumstances are such as to satisfy the court in the exercise of a sound discretion that the enrolled decree ought to be set aside. *Vierling v. Holt,* 197 Md. 522, 80 A. 2d 24 (1951) ; *Pugh v. Waclawski,* 211 Md. 346, 127 A. 2d 376 (1956). While the initial pleading in the Jones case is called a "petition" and those in the Waters and Kennard cases are described as "bills of review," all alleged fraud in one way or another and all appear to be original bills for fraud and we shall so treat them in our consideration of the contentions raised by the appellants.

Since the basic contention is that fraud was practiced on the court in the procurement of the decree, the first question —and perhaps the only one requiring an explicit answer— is what proof was there of the alleged fraud?

Other than what appeared on the face of the proceedings

in the cemetery sale proceeding, there was no proof of fraud in either the Jones or Waters cases. Indeed the named parties plaintiff informed the chancellor (Warnken, J.) that they were relying solely on "irregularity based on lack of due notice" to set aside the decree.

And, in the Kennard case, other than endeavoring to raise inferences of fraud in connection with the several phases of the transaction as a whole—such as proof that the shareholders of McKamer Realty Company and Belair Road Enterprises were the same; that Anderson (of Anderson Enterprises) was a "friendly" defendant in the cemetery sale proceeding (McKamer v. Anderson); that Mercaldo and McAllister had seemingly obtained a "line" on the cemetery by virtue of their positions in the office of the City Solicitor; that Kaufman had "conveniently" lost the records of the cemetery company; and that the appellees had made a large profit on the transaction—the appellants produced no evidence of any actual fraud.

On this evidence, the chancellor (Sodaro, J.) concluded that the evidence before the chancellor (Carter, J.) in the cemetery sale proceeding and the testimony before him (Sodaro, J.) in the Kennard original bill for fraud was substantially the same, and found as a fact that a fraud had not been "perpetrated to deceive the court." In so finding it is evident that the chancellor was not clearly erroneous, and we are therefore without authority to set the decree aside. Rule 886 a.

In this State it is settled that in order to impeach a decree for fraud, the deception practiced in obtaining it must be clearly established by proof before the propriety of the decree can be investigated. *Gregory v. Lenning,* 54 Md. 51, 56 (1880). See also *Burch v. Scott,* 1 G. & J. 393, 425 (1829), *Shryock v. Morris,* 75 Md. 72, 80, 23 Atl. 68 (1891) and Miller, *Equity Procedure,* § 300, for statements to the same effect. Other law writers are in accord. See, for instance, Cooper, *Equity Pleading,* p. 97; Story, *Equity Pleading* (10th ed.), § 426.

It may be—though we do not so decide—that the jurisdictional and constitutional issues raised by the second and third contentions of the appellants could have been raised by a petition filed in the cemetery sale proceeding. However, absent a showing of fraud, it appears that we may not consider such other questions on this appeal. But, be that as it may, it is clear that in some instances, as is the case here, the right to attack an enrolled decree for fraud is even further limited for "[i]t is also well settled that a decree assailed on the charge of fraud will not be set aside for any matter which has been actually considered in the case in which the decree was rendered." *Bachrach v. Washington United Cooperative,* 181 Md. 315, 321, 29 A. 2d 822 (1943). See also 3 Pomeroy, *Equity Procedure,* § 919 a, for a similar statement.

Thus, in the instant case, where there was no proof of fraud, and where substantially the same jurisdictional and constitutional questions raised here were presented, litigated and decided by the chancellor (Carter, J.) in the cemetery sale proceeding when he overruled the exceptions and ratified the sale of the cemetery, we think it is apparent that denial of the relief sought by these original bills for fraud was proper under the circumstances, and we so hold. Having reached this decision, it is unnecessary to decide the questions raised by the appellees.

The order of dismissal in all three cases will be affirmed.

*Orders of dismissal affirmed,*
*appellants to pay the costs.*